UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| TYLER D. SAPP, | ) |
|     Plaintiff, | ) Case No. 1:20-CV-06980 |
| v. | ) Judge Edmond E. Chang |
| COOK COUNTY and FOREST PRESERVES OF COOK COUNTY, | ) |
|     Defendants. | ) |

**MEMORANDUM OPINION AND ORDER**

Tyler Sapp brought this disability-discrimination action against his former employer, the Forest Preserves of Cook County. 42 U.S.C. § 12112(a) (Americans with Disabilities Act); R. 1, Compl. ¶ 1.[1] Sapp was a police officer for the Forest Preserves, but was dismissed from the job after being diagnosed with Bipolar Affective Disorder. Compl. ¶¶ 13, 33–38. Sapp sued the Forest Preserves and now, after the close of discovery, the parties bring cross-motions for summary judgment. R. 37, Defs.' Mot. Summ. J.; R. 41, Pl.'s Mot. Summ. J. For the reasons explained in this Opinion, the Forest Preserves' motion is granted because no reasonable jury could find, even giving Sapp the benefit of all doubt, that Sapp was a qualified individual under the Americans with Disabilities Act, 42 U.S.C. § 12112(a). Sapp's corresponding summary judgment motion is denied.

---

[1]The Court has subject matter jurisdiction over this case under federal-question jurisdiction. 28 U.S.C. § 1331. Citations to the record are "R." followed by the docket entry number and, if needed, a page or paragraph number. Sapp also sued the County of Cook as the indemnifier of judgments entered against the Forest Preserves.

## I. Background

In deciding a motion for summary judgment, the Court views the evidence in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The facts below are undisputed unless otherwise noted.[2]

Tyler Sapp worked as a full-time police officer for the Forest Preserves since January 2009 until he was dismissed in January 2019. R. 39, DSOF ¶ 1; Compl. ¶ 13. Among other duties, Forest Preserves police officers are expected to "[r]espond to emergency calls for service and provide direction and assistance during emergencies such as serious illness or injury, severe weather, fires, bomb threats …." DSOF ¶ 3; R. 39-3, Defs.' Interrogatory Ans. 14. Police officers also must possess the following attributes: "Ability to think clearly and decisively in stressful and challenging situations. Ability to analyze situations and adopt quick, effective and reasonable courses of action." DSOF ¶ 4; Defs.' Interrogatory Ans. 14.

On April 22, 2018, Sapp's spouse called 911 because he was agitated and she reported that he was "hallucinating and delusional." DSOF ¶ 6; R. 42-3, Sapp Dep. 29:1–30:5. Sapp's spouse also reported that "he punched a hole in the wall and there were over 30 firearms in the residence." DSOF ¶ 6; R. 39-6, Goldstein Aff. ¶ 12. Sapp's

---

[2]Typically, when addressing cross-motions for summary judgment, this Court articulates the factual background construing the facts in the light most favorable to the non-moving party when the Court is considering the moving party's motion. The Court would then do the converse when considering the opposing party's summary judgment motion. Here, even construing the facts in Sapp's favor, the defense motion must be granted. So the Court just sets forth the facts in the light most favorable to Sapp.

spouse expressed concerns for her safety as well as the safety of their four-year-old son. DSOF ¶ 6; Goldstein Aff. ¶ 12. Sapp agreed to be transported by ambulance to the Community Hospital in Munster, Indiana, where he stayed three days (till April 25, 2018). DSOF ¶¶ 6–7; Goldstein Aff. ¶¶ 12–13. Sapp was then transferred to St. Catherine Hospital Behavioral Health System for inpatient psychiatric hospitalization, it was there where Sapp was diagnosed with Bipolar Affective Disorder. DSOF¶ 7; Goldstein Aff. ¶ 13. The hospital staff also noted Sapp did "experience suicidal ideation and urges along with rapidly shifting mood swings." DSOF¶ 7;Goldstein Aff. ¶ 13. Even now Sapp remains afflicted with Bipolar Affective Disorder. DSOF ¶ 8; Sapp Dep. 30:11–12.

When all this happened in April 2018, the Forest Preserves' Chief Attorney, Dennis White, learned about Sapp's hospitalization. R. 39-7, White Aff. ¶ 4. After Sapp was discharged from the hospital, the Forest Preserves granted him leave under the Family and Medical Leave Act. *Id.* ¶ 6. On July 27, 2018, the Forest Preserves received a fax from Sapp's doctor, who opined that Sapp could return to work on July 31. R. 42, PSOF ¶ 11; Sapp Dep. 25:2–4. Michelle Gage, the District's Human Resources Directors, informed Sapp by email that the doctor's note was insufficient to permit him to return to work. DSOF ¶ 11; R. 42-1, Gage Dep. 79:16–80:1.

Instead, a couple of days later, on August 1, Chief Attorney White informed Sapp by email that because Sapp had been hospitalized and treated for Bipolar 1 Disorder, the Forest Preserves needed more information before determining if Sapp could return to work as a police officer. White Aff. ¶ 7. White had Sapp undergo an

3

Independent Medical Examination (known in human-resources circles as an IME) with Dr. Diana Goldstein, a Ph.D. clinical psychologist and clinical neuropsychologist. *Id.* ¶ 8. The purpose of the IME was to determine if Sapp could perform his duties as a police officer without causing harm to himself, other officers, or the public. *Id.*

After Dr. Goldstein assessed Sapp, the examiner determined that Sapp "was not fit to perform the duties of a Forest Preserve Police Officer" because his information processing speed and reaction time were "significantly impaired." DSOF ¶¶ 22, 28; Goldstein Aff. ¶¶ 10,16. As explained by Goldstein, "[p]rocessing speed is a cognitive ability that assesses the time it takes one to receive information, consider it, interpret and integrate it and implement a response." DSOF ¶ 28; Goldstein Aff. ¶ 16. Goldstein also found that Sapp's scores in processing-speed tests fell within the "mild to moderate impaired ranges" across various tasks. DSOF ¶ 28; Goldstein Aff. ¶ 16. In light of the impaired response times, Goldstein determined that Sapp's reaction time posed a "clear safety risk" to himself, other officers, and the public. DSOF ¶ 29; Goldstein Aff. ¶ 17.

Chief Attorney White received Dr. Goldstein's IME Report on January 11, 2019. DSOF ¶ 36; White Aff. ¶ 9. As a result, the Forest Preserves decided to terminate Sapp's employment and White informed Sapp via letter on January 18; the letter specifically noted that Sapp could not perform the essential function of the police-officer job and that the Forest Preserves was "unaware of a reasonable accommodation that would allow you to do so." DSOF ¶ 37; White Aff. ¶ 10. Indeed, Sapp had not asked for an accommodation at any point between his initial hospitalization in April

4

2018 and the firing in January 2019. Sapp Dep. 25:2–11. Sapp only asked to be able to "return to work." Sapp Dep. 23:7–15. Sapp then filed a charge with the EEOC and, later, brought this case. Compl. ¶ 4.

## II. Legal Standard

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

### III. Analysis

Even with the benefit of cross-motions of summary judgment, the parties' arguments pass each other almost completely like ships in the night. The Forest Preserves argues that Sapp's claim fails because he is not a "qualified individual" for purposes of the police officer job in the *field*. R. 38, Defs.' Br. at 7. For his part, Sapp does not actually develop an argument that he could still perform an in-the-field role; instead, he contends that the Forest Preserves should have engaged in the interactive process to find a reasonable accommodation before terminating him. R. 43, Pl.'s Br. at 7–12. He offers no argument against the Forest Preserves' evidence that it reasonably believed Dr. Diana Goldstein's independent medical examination, in which she opined that Sapp's impaired reaction times posed a danger for an in-the-field police officer. DSOF ¶ 29; Goldstein Aff. ¶ 17. But for completeness' sake, the evidence on the essential functions of a police officer is described next.

### A. Essential Functions

Under the Americans with Disabilities Act, an employer cannot "discriminate against a *qualified individual* on the basis of disability." 42 U.S.C. § 12112(a) (emphasis added). The ADA goes on to define "qualified individual" as a person who "with or without reasonable accommodation, can perform the *essential functions* of the employment position …."42 U.S.C. § 12111(8) (emphasis added).

Not surprisingly, the Forest Preserves focuses on the emergency-related duties of police officers in arguing that Sapp's impaired response times rendered him unable to perform the essential functions of the job. Specifically, the ability to "[r]espond to

6

emergency calls for service and provide direction and assistance during emergencies" are (among other things) essential functions of a police officer. DSOF ¶ 3; Defs.' Interrogatory Ans. 14. Officers are also required "to think clearly and decisively in stressful and challenging situations. Ability to analyze situations and adopt quick, effective and reasonable courses of action." DSOF ¶ 4; Defs.' Interrogatory Ans. 14. With that context in place, as explained by Goldstein, "[p]rocessing speed is a cognitive ability that assesses the time it takes one to receive information, consider it, interpret and integrate it and implement a response." DSOF ¶ 28; Goldstein Aff. ¶ 16. Goldstein found that Sapp's scores in processing-speed tests fell within the "mild to moderate impaired ranges" across various tasks. DSOF ¶ 28; Goldstein Aff. ¶ 16. To determine Sapp's "level of effort, motivation, and potential response bias on neurocognitive testing," Goldstein administered a variety of assessments. R. 39-6, Exh. B at 8. Sapp had a "failed performance" for Immediate Recall items, but "improved his score significantly by the Delayed Recall trial" resulting in passing performance on Consistency of Recall. *Id.* Sapp's impaired information processing speed and reaction time, however, led Goldstein to conclude Sapp would be a "clear safety risk" as an officer. *Id.* at 11. In light of the emergency situations officers must face, no reasonable jury could find that Sapp could perform the essential functions of an in-the-field police officer given his impaired reaction time.

### B. Reasonable Accommodation

With no specific response to the inability to perform the essential functions in the field, Sapp argues instead that the Forest Preserves should have offered him a

7

"desk job" as a reasonable accommodation for his disability. Pl.'s Br. at 7. Generally speaking, a disability-discrimination claim under the ADA requires that the plaintiff show that (1) he was disabled under the meaning of the ADA; (2) he was qualified to perform the essential functions of his job either with or without reasonable accommodation; and (3) he suffered an adverse employment action because of his disability. *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014). Sapp contends that he could have performed a "desk job," which would have amounted to a reasonable accommodation as required by the ADA. Pl.'s Br. at 7.

It is true enough that a transfer or a demotion to another position might very well be required as a reasonable accommodation under the ADA. Although Sapp does not cite the case, the Seventh Circuit reiterated that principle in *Ford v. Marion County Sheriff's Office*, 942 F.3d 839, 855 (7th Cir. 2019). There, like here, a law enforcement officer became disabled and sought other non-officer jobs within a government agency. *Id.* at 845–846, 854. The Seventh Circuit did agree that the "ADA required the Sheriff's Office to canvass available positions and, if a vacant job existed that [the plaintiff] was qualified to perform with or without reasonable accommodations, to offer it to her." *Id.* at 854. But the problem for the plaintiff in *Ford*—and the same problem for Sapp here—was that the deputy sheriff "needed to come forward with evidence that a more equivalent position for which she was qualified was vacant at the relevant time." *Id.* at 855. She did not, so the employer did not violate the ADA. *Id.*

8

Sapp's claim here is undermined for the same reason; that is, because he has not offered sufficient evidence demonstrating that he could perform the essential functions of an alternative job with a reasonable accommodation. *See Majors v. Gen. Elec. Co.*, 714 F.3d 527, 535 (7th Cir. 2013). Sapp is right that there appears to have been no interactive process with the Forest Preserves (or at the very least, a jury could find for Sapp on that point). But Sapp—even with the benefit of discovery—offers no evidence that there were vacant desk jobs in the Forest Preserves for which he was qualified to perform (no matter how Sapp defines "desk job"). R. 45, Exh. A Perales Aff. ¶ 7. Indeed, Sapp provides no explanation (neither in briefing no in any Rule 56.1 Statement) of what he even means by "desk job." It is not as if there is some universal, generic definition of "desk job" for law enforcement officers (or, for that matter, any employment setting more generally).[3] Sapp has had all the tools of civil-case discovery available to him, and is now required to offer evidence of the possible alternative position. *See Ford*, 942 F.3d at 855. He has failed to do that.

Indeed, it is the Forest Preserves (not Sapp) that provides some explanation for what Sapp may have been referring to. The Forest Preserves police department operates a communications desk, which "receives emergency calls for police assistance; answers inquiries regarding District permitted events; receives citizen

---

[3]Sapp relies on *Spurling v. C&M Fine Pack, Inc.*, 739 F.3d 1055 (7th Cir. 2014), for the proposition that employers must engage in an interactive process with a disabled employee to determine whether a reasonable accommodation is available. Pl.'s Br. at 11–12. That basic point is accurate, but nothing else in *Spurling* helps Sapp here because he has not identified a vacant job that he could perform with a reasonable accommodation.

9

requests to speak to a supervisor; release impounded vehicle paperwork; and receives sick calls from departmental personnel." Perales Aff. ¶ 6. The communications desk is staffed 24 hours a day by both civilians and police officers. *Id.* The Forest Preserves offers evidence that there were no vacant communications-desk positions when Sapp's employment was terminated, Perales Aff. ¶ 7; crucially, Sapp does not rebut this assertion with any evidence whatsoever.

Even if there had been a vacant communications-desk position, Sapp does not provide any evidence (or even argument) to explain why processing and reaction times are not essential functions for a communications desk that handles, among other things, *emergency* calls. Perales Aff. ¶ 6. Yes, there are aspects of the communications desk that do not appear to rely on urgent decision-making, such as releasing impounded vehicle paperwork. *Id.* But the desk does handle emergency calls for police assistance, *id.*, and Sapp offers no evidence on how the Forest Preserves should have restructured the communications desk (or whether it would have been reasonable to require the Forest Preserves to do so). No reasonable jury could find that reassignment to the communications desk was required.

One last point on the purported "desk job" alternative: in one long paragraph, Sapp lists various employees whom he says were offered desk duty as reasonable accommodations, and devotes one or two sentences to each employee as evidence that some form of desk duty was required. Pl.'s Br. at 13–14. But an examination of the string citations reveals that at no point—with one limited exception—does the Verified Complaint, interrogatory answer, or deposition testimony actually describe what

responsibilities constituted the desk duty particular to each of the examples offered by Sapp. *See* Compl. ¶ 18 ("Plaintiff was denied the same terms and conditions afforded to his co-workers who were similarly situated … "); *id.* ¶ 21 ("Officer Devogelear has had two pregnancies on the job and is currently on her second pregnancy."); *see also* R. 42-4, Def.'s Interrogatory Answers ¶ 10 ("Yes, the District accommodated Officer Devogelear during both of her pregnancies by assigned her to the communications Desk or to administrative duties."); R. 42-1, Gage Dep. at 30:4–7, 34:5–8 ("Q: Was Mr. Hildebrandt accommodated at all by the District? A: To my recollection, at one time he was." "Q: Was Eric accommodated in that position, to the best of your recollection? A: He was allowed to work at the communication desk, yes."). It is not clear why the evidence of these accommodations was not developed in more detail, but the burden was on Sapp to do so.

The one exception of a desk duty that was explained more fully can be found in the deposition testimony of Eric Hildebrandt, another Forest Preserve police officer. Hildebrandt described his duties as:

> provide security for the courtroom in regarding to our administrative court hearings. I would write reports, I would answer phones. Delegate – not delegate, but I would answer phones. I would just – I would enter data. I would do a lot of data entry. I would work the magnometer at the front desk, or for the administrative court. Hearings that we have at Aloha. Basically all of those functions.

R. 42-2, Hildebrandt Dep. 11:13–21. There is a two-fold problem with Sapp's reliance on Hildebrandt's description. First, Sapp offers no follow-up evidence on whether the Forest Preserves had a vacant role like this when Sapp's employment was

11

terminated. Second, some of the duties described by Hildebrandt still present, on their face, the kind of reaction times and information processing that Sapp unfortunately could not perform. Hildebrandt still provided security in administrative courtrooms and worked the magnetometer screening at the front desk. *Id.* at 11:13–14, 18–19. Also, it is not clear what Hildebrandt meant by "answer phones," and Sapp presents no more evidence on that point. *Id.* at 11:15. So, the evidence relating to Hildebrandt is insufficient to pose a question for the jury.

## IV. Conclusion

Even viewing the facts in the light most favorable to Sapp, the Forest Preserves' motion for summary judgment must be granted. Sapp's corresponding motion for summary judgment (which would have required viewing the evidence in the Forest Preserves' favor) is denied. The status hearing of October 14, 2022, is vacated. Final judgment will be entered.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: September 21, 2022